## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| JOSEPH CROCONO and ULTAN MCGLONE, derivatively on behalf of HASBRO, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> CHRISTIAN COCKS, CYNTHIA WILLIAMS, KENNETH A. BRONFIN, MICHAEL BURNS, HOPE F. COCHRAN, LISA GERSH, ELIZABETH HAMREN, LINDA ZECHER HIGGINS, BLAKE J. JORGENSEN, TRACY LEINBACH, EDWARD M. PHILIP, LAUREL J. RICHIE, RICHARD S. STODDART, and MARY BETH WEST, <br><br> Defendants, <br><br> and <br><br> HASBRO, INC., <br><br> Nominal Defendant. | Case No.: 1:26-cv-41 <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br> JURY TRIAL DEMANDED |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

### <u>INTRODUCTION</u>

Plaintiffs Joseph Crocono ("Crocono") and Ultan McGlone ("McGlone") (collectively, the "Plaintiffs"), by Plaintiffs' undersigned attorneys, derivatively and on behalf of nominal defendant Hasbro, Inc. ("Hasbro" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants Christian Cocks ("Cocks"), Cynthia Williams ("Williams"), Kenneth A. Bronfin ("Bronfin"), Michael Burns ("Burns"), Hope F. Cochran ("Cochran"), Lisa Gersh ("Gersh"), Elizabeth Hamren ("Hamren"), Linda Zecher Higgins ("Zecher Higgins"), Blake

1

J. Jorgensen ("Jorgensen"), Tracy Leinbach ("Leinbach"), Edward M. Philip ("Philip"), Laurel J. Richie ("Richie"), Richard S. Stoddart ("Stoddart"), and Mary Beth West ("West"), (collectively, the "Individual Defendants," and together with Hasbro, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Hasbro, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Cocks and Williams for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiffs' complaint against the Individual Defendants, Plaintiffs allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of internal corporate documents produced by Defendants to Plaintiffs' counsel,[1] a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Hasbro, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Hasbro's current and/or former directors and officers from September 16, 2021 through October 26, 2023, both dates inclusive (the "Relevant Period").

---

[1] References to "HAS_000000000_" are to the Books and Records.

2.      Hasbro is a Rhode Island corporation and a global leader in the toy, game, and entertainment industry, offering a wide array of consumer products across categories such as toys, games, apparel, music, publishing, film, television, animation, and digital content. Its portfolio includes iconic brands such as Dungeons & Dragons, Magic: The Gathering, Hasbro Gaming, NERF, Transformers, Play-Doh, G.I. Joe, Monopoly, My Little Pony, and Peppa Pig.

3.      Particularly in recent years, the Magic: The Gathering brand ("Magic") has become one of the Company's most important lines of products. Magic is a popular card game which notably features rare cards highly sought after by collectors. Such cards may fetch upwards of thousands of dollars on the secondary market.

4.      Given the nature of Magic's secondary market, the rate at which new Magic card sets are printed and sold directly impacts the value of existing Magic cards to collectors. As such, the overprinting of new Magic sets would reduce the value of existing Magic sets. Although analysts and investors consistently inquired as to whether the Company was in fact overprinting Magic sets, the Individual Defendants repeatedly denied such speculation.

5.      Rather, the Individual Defendants claimed that the Company printed Magic sets according to its "segmentation" strategy. According to the Company's segmentation strategy, new Magic sets were to be printed to meet demand from new consumer segments.

6.      For instance, on September 16, 2021, the first day of the Relevant Period, the Company held an investor call (the "September 2021 Investor Call"). During the September 2021 Investor Call, Defendant Cocks stated that Magic was "***not trying to build one product for one customer that has to buy everything***," because "***the real growth and the real driver for us has been thinking about things on a segmented basis***."[2]

---

[2] Unless otherwise stated, all emphasis is added.

7.     The truth began to emerge on November 14, 2022, when Bank of America ("BofA") issued a report that the Company had been "overprinting" Magic sets and risked damaging the value of the Magic brand (the "BofA Report").

8.     On this news, the price of the Company's stock fell $6.25, or approximately 9.9%, from a closing price of $63.41 per share on November 11, 2022, to close at $57.16 per share on November 14, 2022.

9.     Nonetheless, the Individual Defendants continued to downplay the negative implications of its printing strategy as it pertained to Magic products. For instance, on December 8, 2022, the Company hosted a special call with investors (the "December 2022 Special Call"). During the call, Defendant Williams stated that "***[o]ur growth has come from monetizing more player segments and not just from increasing the spend of the same core set of players, and our product release schedule really reflects that***."

10.     The truth continued to emerge on January 26, 2023, when the Company issued a press release to announce its financial results for the fourth quarter and full year of 2022 (the "Q4 2022 Press Release"). The Q4 2022 Press Release reported that the Wizards of the Coast & Digital Gaming ("Wizards") segment had fallen significantly short of the Company's guidance for year-over-year fourth quarter revenue growth. The Q4 2022 Press Release further noted that the Company would "eliminat[e] . . . approximately 15% of its global workforce" in the coming year, and that its COO would be departing from their position.

11.     On this news, the price of the Company's stock fell $5.17, or approximately 8.1%, from a closing price of $63.78 per share on January 26, 2023, to close at $58.61 per share on January 27, 2023.

12.     Nevertheless, the Individual Defendants continued to downplay the consequences of its protocols for printing Magic products. For instance, on April 27, 2023, the Company hosted an earnings call to discuss its financial results for the first quarter of 2023 (the "Q1 2023 Earnings Call") with investors and analysts. During the Q1 2023 Earnings Call, Defendant Cocks stated that "***Our owned inventory is up a bit, but most of that has to do with kind of the nature of Wizards production***."

13.     The truth finally emerged on October 26, 2023, before the market opened, when Hasbro issued a press release to announce its disappointing financial results for the third quarter of 2023 (the "Q3 2023 Press Release"). The Q3 2023 Press Release reported that the Company had "[r]educed owned inventory [by] 27%[,]" but further noted that Consumer Products inventories has decreased by 34%. During an earnings call held that same day (the "Q3 2023 Earnings Call"), the Individual Defendants stated that the "reduc[tion in] total owned inventory" was "***primarily driven by [the] reduction in [non-Wizards] inventory***[.]"

14.     On this news, the price of the Company's stock fell $8.91 per share, or approximately 16.3%, from a closing price of $54.75 per share on October 25, 2023, to close at $45.84 per share on October 27, 2023.

15.     During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Hasbro, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) Hasbro's strategy with regard to printing Magic cards was not as carefully thought out as portrayed; (2) the Company was in fact printing a volume of Magic sets which exceeded consumer demand; (3) the Company's inventory allocation management was problematic, particularly as it

pertained to the Company's printing strategy for Magic sets; (4) the Company was overloading the market with Magic sets to generate revenue and to offset shortfalls within the Company; (5) as a result of the Company's overprinting of Magic sets, existing Magic cards were devalued; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

16.    The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

17.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

18.    Additionally, the Individual Defendants caused the Company substantial harm by causing it to repurchase its own shares at artificially inflated prices. In total, the Company spent an aggregate amount of ***approximately $125 million*** to repurchase approximately 1.4 million shares of its own common stock at artificially inflated prices from April 2022 to July 2022. In total, this caused the Company to overpay for repurchases of its own stock by approximately $55.9 million.

19.    In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), and former President of Wizards of the Coast & Hasbro Gaming to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the

Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

20.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

21.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and Defendants Cocks and Williams' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves and the other Individual defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

23.    This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

24. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

25. The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of Rhode Island or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

26. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiffs

27. Plaintiff Crocono is a current shareholder of Hasbro. Plaintiff Crocono has continuously held Hasbro common stock since first purchasing on March 3, 2021.

28. Plaintiff McGlone is a current shareholder of Hasbro. Plaintiff McGlone has continuously held Hasbro common stock since first purchasing on September 10, 2020.

### Nominal Defendant Hasbro

29. Hasbro is a Rhode Island corporation with its principal executive offices at 1027 Newport Avenue, Pawtucket, Rhode Island. Hasbro shares trade on the NASDAQ Capital Market ("NASDAQ") under the ticker symbol "HAS."

### Defendant Cocks

30. Defendant Cocks has served as the Company's CEO and as a Company director since February 2022. Defendant Cocks also served as the President of Wizards from 2016 to February 2022.

8

31.     According to the Schedule 14A the Company filed with the SEC on April 4, 2025 (the "2025 Proxy Statement"), Defendant Cocks received $16,841,413 in the fiscal year ended December 29, 2024 (the "2024 Fiscal Year"). This included $1,500,000 in salary, $10,500,024 in stock awards, $4,429,688 non-equity incentive plan compensation, and $411,701 in all other compensation. Defendant Cocks received $15,110,809 in total compensation in the fiscal year ended December 31, 2023 (the "2023 Fiscal Year"). This included $1,500,000 in salary, $7,875,020 in stock awards, $3,086,034 in option awards, $1,944,000 in non-equity incentive plan compensation, and $705,815 in all other compensation.

32.     The 2025 Proxy Statement stated the following about Defendant Cocks:

Chris Cocks has served as Chief Executive Officer of Hasbro since February 2022. Prior to that, he served as President and Chief Operating Officer of Wizards of the Coast and Digital Gaming since 2021 and prior to that served as President of Wizards of the Coast since 2016, when he joined Hasbro from Microsoft. During his 14 years at Microsoft, Mr. Cocks led a global sales and technical engagement team as Vice President, OEM Technical Sales and served in product management and marketing leadership positions at MSN and Xbox Games, where he worked on hit franchises like HALO and FABLE.

**Defendant Williams**

33.     Defendant Williams served as the Company's President of Wizards of the Coast & Hasbro Gaming from February 2022 to April 26, 2024.

34.     According to the Schedule 14A the Company filed with the SEC on April 3, 2024 (the "2024 Proxy Statement"), Defendant Williams received $5,011,520 for the 2023 Fiscal Year. This included $614,423 in salary, $500,000 in bonuses, $2,250,054 in stock awards, $881,730 in option awards, $684,314 in non-equity incentive plan compensation, and $81,000 in all other compensation.

**Defendant Bronfin**

35.     Defendant Bronfin served as a Company director from 2008 to May 18, 2023.

36.     The Schedule 14A the Company filed with the SEC on April 25, 2022 (the "2022 Proxy Statement") stated the following about Defendant Bronfin:

> Kenneth A. Bronfin is Senior Managing Director of Hearst Ventures (the strategic investment division of diversified media, information and services company Hearst Corporation), serving in this role since 2013. Prior to that, he served as President of Hearst Interactive Media since 2002, and Deputy Group Head of Hearst Interactive Media since 1996.

**Defendant Burns**

37.     Defendant Burns served as a Company director from 2014 to May 16, 2024.

38.     The Schedule 14A the Company filed with the SEC on April 3, 2023 (the "2023 Proxy Statement") stated the following about Defendant Burns:

> Michael R. Burns is the Vice Chairman and a member of the board of directors of Lions Gate Entertainment Corp. (a global entertainment company with significant motion picture and television operations), serving in this role since 2000. Lions Gate acquired Starz in December 2016. From 1991 to 2000, Mr. Burns was the Managing Director and Head of the Los Angeles Investment Banking Office of Prudential Securities Inc.

**Defendant Cochran**

39.     Defendant Cochran has served as a Company director since 2016. She also serves as the Chair of the Financial and Capital Allocation Committee and as a member of the Audit Committee.

40.     The 2025 Proxy Statement stated the following about Defendant Cochran:

> Hope F. Cochran is a Managing Director at Madrona Venture Group, a technology-focused venture capital group. Prior to joining Madrona in January 2017, Ms. Cochran was the Chief Financial Officer of King Digital Entertainment, the creator of Candy Crush and other successful mobile games, from 2013 to 2016, where she helped drive the company's business and revenue growth, guided the Company's IPO and successfully completed a $5.9 billion acquisition by Activision. From 2005 to 2013, Ms. Cochran was a financial executive at Clearwire, Inc., serving as Chief Financial Officer from 2011 to 2013.

**Defendant Gersh**

41.    Defendant Gersh has served as a Company director since 2010. She also serves as the Chair of the Compensation and Talent Committee and as a member of the Nominating, Governance and Social Responsibility Committee.

42.    The 2025 Proxy Statement stated the following about Defendant Gersh:

> Lisa Gersh is an outside advisor to companies investing in the media space. She previously served as the Chief Executive Officer of Alexander Wang (a global fashion brand) from October 2017 to October 2018. Ms. Gersh served as the Chief Executive Officer of Goop, Inc. (a lifestyle publication curated by Gwyneth Paltrow) from 2014 to 2016, and President and Chief Executive Officer of Martha Stewart Living Omnimedia, Inc. (an integrated media and merchandising company) from 2012 to 2013.

**Defendant Hamren**

43.    Defendant Hamren has served as a Company director since April 2022. She also serves as a member of the Compensation Committee.

44.    The Company's 2025 Proxy Statement stated the following about Defendant Hamren:

> Elizabeth Hamren has served as Chief Executive Officer of Ring, Inc., an Amazon smart doorbell and home security company, since March 2023. Prior to that she served as Chief Operating Officer at Discord Inc., a voice, video and text communication service that enables people to gather virtually, including while gaming, from December 2021 to March 2023. Prior to joining Discord, Ms. Hamren served as a Corporate Vice President at Microsoft Corporation from March 2017 to December 2021 running product and engineering for Xbox consumer products, including developing and launching the Xbox Series X|S and leading Xbox Game Pass. Prior to that, from August 2015 to March 2017, she led Global Marketing and Sales for Oculus at Meta Platforms, Inc. (formerly Facebook, Inc.), where she launched the industry-defining Oculus Rift virtual reality headset. Ms. Hamren holds a BSE in Civil Engineering and Operations Research from Princeton University, and an M.B.A. from Harvard Business School.

**Defendant Jorgensen**

45.    Defendant Jorgensen served as a Company director from April 2022 to May 2025. While on the Board, Defendant Jorgensen served as the Chair of the Audit Committee and as a member of the Financial and Capital Allocation Committee.

46.    The 2024 Proxy Statement stated the following about Defendant Jorgensen:

Blake J. Jorgensen is the former Executive Vice President and Chief Financial Officer of, PayPal Holdings Inc., which he joined in 2022. Prior to that, he spent a decade as Chief Financial Officer and Chief Operating Officer of Electronic Arts Inc. ("EA"), where helped to drive the transformation of the company. Mr. Jorgensen has over 20 years of experience in finance across various industries with a deep understanding of finance, consumer products, technology and gaming. Prior to joining EA, Mr. Jorgensen served as Executive Vice President and Chief Financial Officer of Levi Strauss & Co. from July 2009 to August 2012 and was Executive Vice President and Chief Financial Officer of Yahoo! Inc. from June 2007 to June 2009. Before joining Yahoo! Inc., Mr. Jorgensen also served as the Chief Operating Officer and Co-Director of Investment Banking at Thomas Weisel Partners, which he co-founded in 1998. He has also held financial and operational positions at Montgomery Securities, MAC Group/Gemini Consulting and Marakon Associates. Mr. Jorgensen earned his M.B.A. from Harvard Business School and his undergraduate degree from Stanford University.

**Defendant Leinbach**

47.    Defendant Leinbach served as a Company director since 2008 to May 2024. While on the Board, she served as a member of the Audit Committee, the Finance and Capital Allocation Committee, and the Nominating, Governance and Social Responsibility Committee.

48.    The 2023 Proxy Statement stated the following about Defendant Leinbach:

Tracy A. Leinbach served as interim Chair of the Board from October 2021 to February 2022, following the passing of the Company's long-time Chairman and CEO, Brian Goldner. She previously served as Executive Vice President and Chief Financial Officer for Ryder System, Inc. (a global logistics and transportation and supply chain solutions provider) from 2003 until 2006. Prior thereto, Ms. Leinbach served as Executive Vice President, Fleet Management Solutions for Ryder since 2001, where she had increasing responsibilities for finance and operational matters. Prior to her career with Ryder, Ms. Leinbach worked for PricewaterhouseCoopers in public accounting and was a CPA.

**Defendant Philip**

49.     Defendant Philip served as a Company director from 2002 to May 2023. While on the Board, Defendant Philip served as a member of the Compensation Committee and the Nominating, Governance and Social Responsibility Committee.

50.     The 2022 Proxy Statement stated the following about Defendant Philip:

Edward M. Philip served as the Chief Operating Officer of Partners in Health (a non-profit healthcare organization) from January 2013 to March 2017. In addition, Mr. Philip was a Special Partner at Highland Consumer Fund (consumer-oriented private equity fund), serving in this role from 2013 to 2017. He served as Managing General Partner at Highland Consumer Fund from 2006 to 2013. Prior to that, Mr. Philip served as President and Chief Executive Officer of Decision Matrix Group, Inc. (research and consulting firm) from May 2004 to November 2005, and was Senior Vice President of Terra Networks, S.A. (global Internet company) from October 2000 to January 2004. In 1995, Mr. Philip joined Lycos, Inc. (an Internet service provider and search company) as one of its founding members. During his time with Lycos, Mr. Philip held the positions of President, Chief Operating Officer and Chief Financial Officer at different times.

**Defendant Richie**

51.     Defendant Richie has served as a Company director since 2020. She also serves as a member of the Compensation and Talent Committee and the Nominating, Governance and Social Responsibility Committee.

52.     The Company's 2025 Proxy Statement stated the following about Defendant Richie:

Laurel J. Richie has been an independent leadership and branding consultant since 2015. Prior to her current role, Ms. Richie served as President of the Women's National Basketball Association LLC ("WNBA") from May 2011 to November 2015. Prior to her appointment as President of the WBNA in 2011, she served as Chief Marketing Officer of Girl Scouts of the United States of America from 2008 to 2011. From 1984 to 2008, she held various positions at Ogilvy & Mather, including Senior Partner and Executive Group Director and founding member of the agency's Diversity Advisory Board. Ms. Richie is a former Trustee of the Naismith Basketball Hall of Fame and the Dartmouth College Board of Trustees where she served as chair from 2017-2021. She currently serves as a consultant to Fortune 100 c-suite executives on matters of personal leadership and corporate culture.

**Defendant Stoddart**

53.     Defendant Stoddart has served as a Company director since 2014. He currently serves as the Chairman of the Board, and he is also a member of the Compensation and Talent Committee as well as the Nominating, Governance and Social Responsibility Committee. Previously, he served as the Company's Interim CEO from October 2021 to February 2022.

54.     The Company's 2025 Proxy Statement stated the following about Defendant Stoddart:

> Richard S. Stoddart has served as Hasbro's Chair of the Board since February 2022. Prior to that, he served as Hasbro's interim Chief Executive Officer from October 2021 to February 2022, following the passing of the Company's former Chairman and CEO, Brian Goldner. Mr. Stoddart is the former President and Chief Executive Officer of InnerWorkings, Inc. (a global marketing execution firm), serving in that role from 2018 until 2020 when Innerworkings, Inc. was acquired. Mr. Stoddart was the Chief Executive Officer of Leo Burnett Worldwide from February 2017 to 2018, the Chief Executive Officer of Leo Burnett North America from 2013 to 2016 and the President of Leo Burnett North America from 2005 to 2013.

**Defendant West**

55.     Defendant West has served as a Company director since 2016. She also serves as the Chair of the Nominating, Governance and Social Responsibility Committee and as a member of the Finance and Capital Allocation Committee.

56.     The Company's 2025 Proxy Statement stated the following about Defendant West:

> Mary Beth West has served as a senior advisor to McKinsey & Co. for the past four years. Prior to that, she served as Senior Vice President, Chief Growth Officer of The Hershey Company from May 2017 until January 2020. Ms. West served as Executive Vice President, Chief Customer & Marketing Officer of J.C. Penney Company from 2015 through March 2017. From 2012 to 2014, she was the Executive Vice President, Chief Category & Marketing Officer for Mondelez International, Inc. Prior thereto, from 1986 to 2012, she served in various financial roles of increasing responsibility and culminating in her role as the Chief Marketing Officer for Kraft Foods, Inc.

**Defendant Zecher Higgins**

57.    Defendant Zecher Higgins served as a Company director from 2014 to May 2024. While on the Board, Defendant Zecher Higgins served as Chair of the Cybersecurity and Data Privacy Committee and as a member of the Audit Committee.

58.    The 2023 Proxy Statement stated the following about Defendant Zecher Higgins:

> Linda Zecher Higgins is the Chief Executive Officer and Managing Partner of the Barkley Group (a consulting firm focused on cybersecurity and digital transformation), serving in this capacity since January 2017. Prior to that, Ms. Higgins served as the President and Chief Executive Officer, and a member of the Board of Directors, of Houghton Mifflin Harcourt Company, from 2011 to 2016. Prior to that, she was Corporate Vice President, Worldwide Public Sector of Microsoft Corporation from 2003 to 2011.

**Relevant Non-Parties**

59.    The Consolidate Amended Complaint in the Securities Class Action captioned *West Palm Beach Firefighters' Pension Fund v. Hasbro, Inc., et al.*, Case No. 1:24-cv-08633-VSB, in the Southern District of New York, incorporates statements from former employees of Hasbro who offered their experiences. The following are the former employees whose statements are referenced throughout this complaint before this court.

*FE 1*

60.    FE 1 [3] previously served as the Wizards VP from September 2021 until his departure from the Company in July 2025. FE 1's responsibilities included holding weekly business reviews and monthly financial reviews, conducting long-range planning, and notably aiding in the creation of new Magic sets at Defendant Cocks' instruction. During the course of FE 1's tenure at the Company, he met regularly with and reported to Defendant Williams and received regular briefings in executive-level and board-level meetings.

---

[3] Former Hasbro employees are herein referred to as "FE #" and are all referenced using masculine pronouns to maintain their confidentiality.

*FE 2*

61.     FE 2 previously served the Company as a Wizards Community Manager for Magic from August 2021 through December 2023. FE 2's responsibilities at the Company included the creation and maintenance of Magic social media accounts, observing and recording consumer sentiment, moderating online Magic communities, communicating with Magic players and consumers both in person and online, and compiling his findings into weekly reports. FE 2 attended weekly meetings with analysts such as Nisperos and Rasmussen to discuss Magic consumer feedback in addition to attending Wizards town hall meetings with Defendant Williams.

*FE 3*

62.     FE 3 previously served as one of the Company's Senior Vice Presidents during the Relevant Period. During his tenure, FE 3 attended quarterly business review meetings with Defendant Cocks and other Company executives.

*FE 4*

63.     FE 4 previously served the Company as Senior Director of Marketing at Wizards during the Relevant Period. During his tenure, FE 4 attended weekly executive leadership meetings with the Individual Defendants.

*FE 5*

64.     FE 5 previously served the Company as its Head of Marketing for Italy during the Relevant Period. During his tenure, FE 5 engaged in frequent dialogue with members of the Wizards' team in Italy.

*FE 6*

65.     FE 6 previously served the Company from January 2022 and March 2025, serving as a Wizards Play Network liaison between the Company and hundreds of hobby shops throughout

fourteen U.S. states. As such, FE 6 engaged in numerous conversations with Company employees and retail sellers pertaining to the sale of Magic products.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

66.     By reason of their positions as officers and/or directors of Hasbro and because of their ability to control the business and corporate affairs of Hasbro, the Individual Defendants owed Hasbro and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Hasbro in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Hasbro and its shareholders so as to benefit all shareholders equally.

67.     Each director and officer of the Company owes to Hasbro and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

68.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Hasbro, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

69.     To discharge their duties, the officers and directors of Hasbro were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

70.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable

violation of their obligations as directors and/or officers of Hasbro, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Hasbro's Board at all relevant times.

71.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

72.    To discharge their duties, the officers and directors of Hasbro were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Hasbro were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Rhode Island and the United States, and pursuant to Hasbro's own Code of Conduct ("Code of Conduct");

18

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Hasbro conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Hasbro and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Hasbro's operations would comply with all applicable laws and Hasbro's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

73.     Each of the Individual Defendants further owed to Hasbro and the shareholders the duty of loyalty requiring that each favor Hasbro's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

74.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Hasbro's and were at all times acting within the course and scope of such agency.

75.     Because of their advisory, executive, managerial, and directorial positions with Hasbro, each of the Individual Defendants had access to adverse, non-public information about the Company.

76.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Hasbro.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

77.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

78.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

79.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Hasbro was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

80.     Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

81.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Hasbro and was at all times acting within the course and scope of such agency.

## HASBRO'S CODE OF CONDUCT

82.     The Company's Code of Conduct applies to "all employees of Hasbro, regardless of position. Our Board of Directors . . . serve as an extension of Hasbro and their conduct can have an impact on our Company." Further, Defendant Cocks, stated in a signed prefatory letter, in relevant part: "[o]ur Code of Conduct outlines our core values and remains the foundation that guides us in our decisions. Employees are expected to read and understand our Code."

83.    Under the heading, "Employee Responsibilities" the Code of Conduct states:

- Act in a professional, safe and ethical manner that is consistent with Hasbro's values.

- Be familiar with the information contained in our Code as well as applicable laws and company policies. Pay particular attention to the policies that pertain to your job responsibilities.

- Promptly report concerns about possible violations of laws, regulations, our Code or policies to your manager or to any of the resources listed in our Code.

- Fully cooperate when responding to an investigation or audit.

- Remember: pressure or demands due to business conditions are never an excuse for violating the law or our Code.

84.    Under the section "Our Responsibilities in the Marketplace," in the subsection titled, "Creating and Maintaining Business Records," the Code of Conduct provides, in relevant part:

All of us contribute to the process of recording financial and non-financial information. Business partners, government and regulatory officials and the public rely on our accurate and thorough disclosures and business records. Such information is also essential within Hasbro so that we can make good decisions.

- Be open, honest and accurate when creating business records.
- Never make false or dishonest entries about our business and performance – good or bad.
- Unrecorded funds or assets are never acceptable.
- Ensure all transactions are properly authorized.

85.    Under the same heading, in the subsection titled "Acquiring Business Intelligence," the Code of Conduct states the following:

When collecting business intelligence we must never engage in fraud, misrepresentation or deception to obtain information. When we hire former employees of competitors, we need to properly determine if there are any valid legal obligations of those employees and not use, or encourage them to disclose, the confidential information of their former employers or solicit employees from their former employers, if there are such restrictions.

- Obtain competitive information only through legal and ethical means.
- Require that third parties acting on our behalf live up to our standards.

86.     Under the same heading, in a subsection titled "Communicating with the Public," the Code of Conduct states," in relevant part:

> When we share information with the public, it is important that we do so carefully and that we are consistent and speak with one, clear voice.
>
> - If you are involved in preparing documents for public communications or filings with government agencies, always strive to be clear, objective, fair, accurate, complete, and timely.

87.     Under the same heading, in the subsection titled "Insider Trading," the Code of Conduct states the following, in relevant part:

> You may become aware of information about Hasbro or about other companies that is not publicly available. Using this 'inside information' for personal gain, sharing it with others, or spreading false rumors, is illegal and against our values.
>
> - Never buy or sell any securities if you have inside information. Nor should you pass on inside information or "tips" to others.
> - When trading, use care even if you think you are not relying on inside information.
> - Remember these rules continue to apply when you are no longer a Hasbro employee.

88.     Under the heading "Conflicts of Interest," the Code of Conduct states the following, in relevant part:

> A conflict of interest may occur when our personal interests or activities affect our ability to make objective decisions for Hasbro. The best approach to handling possible conflicts is to disclose situations to your manager that might create a conflict, or even the appearance of a conflict; also you must complete the Conflict of Interest Disclosure form. Once disclosed, we then have the opportunity to better address the situation.
>
> You are not allowed to engage in activities that create a conflict of interest or the appearance of a conflict of interest.

89.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of

corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. Moreover, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct and law.

## **HASBRO'S AUDIT COMMITTEE CHARTER**

90.    The Company's Audit Committee Charter (the "Audit Committee Charter") defines the responsibilities of the Company's Audit Committee.

91.    Per the Audit Committee Charter, the primary purpose of the Audit Committee is to:

> (a) appoint the independent auditor and oversee the independent auditor's work, (b) prepare the report required to be included in the Company's annual proxy statement by the rules of the Securities and Exchange Commission and (c) assist the Board of Directors (the "Board") of the Company in its oversight of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the independent auditor's qualifications and independence, and (iv) the performance of the Company's internal audit function and independent auditor.

> In discharging its oversight role, the Committee is empowered to investigate any matter with full access to all books, records, facilities and personnel of the Company and the power to retain outside counsel, auditors or other experts for this purpose. The Board and the Committee are in place to represent the Company's shareholders; accordingly, the independent auditor is ultimately accountable to the Board and the Committee.

92.    Under the heading "Key Responsibilities," the Audit Committee Charter outlines, in relevant part:

> The Committee's job is one of oversight and it recognizes that the Company's management is responsible for preparing the Company's financial statements and that the independent auditors are responsible for auditing those financial statements. Additionally, the Committee recognizes that the Company's management, as well as the independent auditors, have more time, knowledge and more detailed information with respect to the Company than do Committee members; consequently, in carrying out its oversight responsibilities, the Committee is not providing any expert or special assurances as to the Company's

financial statements or any professional certification as to the independent auditor's work.

While the Committee has the responsibilities set forth in this Charter, it is not the responsibility of the Committee to plan or conduct audits or to determine that the Company's financial statements are complete and accurate and are in accordance with generally accepted accounting principles.

The Committee has direct and sole responsibility for the appointment, compensation, retention, oversight and replacement, if necessary, of the independent auditor, including the resolution of disagreements between management and the independent auditor regarding financial reporting, and the independent auditor is ultimately accountable to the Board and to the Committee, acting as a committee of the Board. Each member of the Committee shall be entitled to rely on (i) the integrity of those persons and organizations within and outside the Company that it receives information from and (ii) the accuracy of the financial and other information provided to the Committee by such persons or organizations absent actual knowledge to the contrary (which shall be promptly reported to the Board). The Committee has the authority to retain legal, accounting or other experts that it determines to be necessary to carry out its duties. It also has authority to determine compensation for such advisors, as well as for the independent auditor.

93.    Under the same heading, in the subsection titled "Oversight of Audit Process and Company's Compliance and Risk Management," the Audit Committee Charter also states, in relevant part:

- The Committee shall also discuss the results of the quarterly review and any other matters required to be communicated to the Committee by the independent auditor under generally accepted auditing standards, including the matters required to be discussed by Statement of Auditing Standards ("SAS") No. 100.

- The Committee shall review with management and the independent auditor the audited financial statements and MD&A to be included in the Company's Annual Report on Form 10-K prior to the filing of such report.

- The Committee shall discuss the results of the annual audit and any other matters required to be communicated to the Committee by the independent auditor under generally accepted auditing standards, including the matters required to be discussed by SAS No. 61, and shall be responsible for recommending to the full Board the inclusion of the Company's audited financial statements in the Form 10-K.

- The full Board, as assisted by management, the independent auditors and the Committee, shall have the ultimate authority and responsibility to include the audited financial statements in the Company's Annual Report on Form 10-K (or the Annual Report to Shareholders if distributed prior to the filing of Form 10-K).

- In connection with its review of the financial statements and MD&A to be included in the Company's quarterly reports on Form 10-Q and Annual Reports on Form 10-K, the Committee shall discuss with management and the independent auditor their qualitative judgments about the appropriateness, and not just the acceptability, of accounting principles and financial disclosure practices used or proposed to be adopted by the Company, the reasonableness of significant judgments, including a description of any transactions as to which the management obtained Statement on Auditing Standards No. 50 communications, and the clarity of disclosures in the financial statements, including the Company's disclosures of critical accounting policies and other disclosures under "MD&A".

- The Committee shall review with internal auditors and the independent auditor any difficulties with audits and management's response to such issues.

\*\*\*

- The Committee shall discuss with management, internal auditors and the independent auditor the Company's system of internal controls, the Company's critical accounting principles and any significant issues related to financial statement presentations, including any changes in the Company's critical accounting policies and the effects of alternative GAAP methods, off-balance sheet structures and regulatory and accounting initiatives.

- The Committee shall review and discuss with management, internal auditors and independent auditors the Company's significant financial and other exposures, including material pending legal proceedings and other material contingent liabilities, and guidelines and policies relating to enterprise risk assessment and risk management, including the Company's procedures for monitoring and controlling such risks.

- The Committee shall review and discuss with management, the internal auditors and the independent auditors, the Company's programs, governance, systems, controls and procedures relating to cybersecurity, data privacy and data protection. The Committee shall review and discuss the Company's risk exposures in these areas and the steps management takes to identify, assess, monitor and mitigate such exposures.

\*\*\*

26

- The Committee shall review and discuss with management earnings press releases and financial information and earnings guidance provided to analysts and rating agencies.

  ***

- In connection with and prior to giving their required certifications, the Company's Chief Executive Officer and Chief Financial Officer must disclose to the independent auditors and the Committee all significant deficiencies and material weaknesses in the design or operation of internal controls, and any fraud that involves management or other employees who have a significant role in the Company's internal controls.

  ***

- The Committee shall review management's plan for assuring compliance with the Company's Code of Conduct and other Company programs designed to promote regulatory compliance and ethical business conduct.

94.     The Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by engaging in or permitting the Company to engage in issuing materially false and misleading statements to the investing public and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background on Hasbro

95.    Hasbro is a multinational corporation engaged in the toy, game, and entertainment industries. Throughout its history, Hasbro marketed and sold a wide array of consumer products under its well-known brands, including toys, games, apparel, music, publishing, film, television, animation, and various forms of digital content.

96.    The Company operates through three primary business segments: Consumer Products, Wizards of the Coast & Digital Gaming, and Entertainment. The Consumer Products segment is responsible for the sourcing, marketing, and sale of toy and game products worldwide. The Entertainment segment is responsible for the development and production of Company-branded entertainment such as film, television, and live entertainment.

97.    The Company's Wizards segment is responsible for promoting the Company's brand through the development of its trading card, digital game, and role-playing experiences. As discussed below, FE 5 reported that Wizards was the only Company segment other than Consumer Products which possessed inventory. Notably, the Wizards of the Coast & Digital Gaming segment contains the Magic business. As noted above, Magic is a card-based strategy game with a significant element of collectability and a sometimes-lucrative secondary market for cards.

98.    Magic cards are sold in randomly assorted packs, and feature levels of rarity in accordance with their chance of appearing in a pack. In ascending level of rarity, Magic cards may be assigned as "common," "uncommon," "rare," or "mythic rare." As such, Magic cards can fetch anywhere from hundreds to tens-of-thousands of dollars on the secondary market, depending on their rarity. Notably, one of the rarest Magic cards, the "Black Lotus," was sold on the secondary market in mid-2021 for $800,000.

99.    Throughout the Relevant Period, Hasbro's Magic business was a key area of focus for investors, increasingly due to concerns that the Company was overprinting sets of Magic cards.

**Magic's Rapid Growth and Impact on the Wizards Segment**

100.    Prior to 2016, the Wizards segment was not a major contributor to the Company's financial results. With the appointment of Defendant Cocks as President of Wizards in 2016, however, the segment began a meteoric rise as compared to the Company's other segments. Notably, Wizards met its goal to double revenue in 2021 well ahead of schedule. Moreover, that same year the Wizards segment provided $547 million out of the Company's reported operating profit of $763.3 million.

101.    Notably, the main factor behind Wizards' ascent within the Company was the Magic business. As such, Magic was itself a major factor behind the Company's financial success. For instance, in 2021 the Magic business accounted for 15% of the Company's total net revenue. In 2022, Magic became the Company's first billion-dollar brand.

**Hasbro's Segmentation Strategy**

102.    Following Defendant Cocks' appointment as President of the Company's Wizards segment in 2016, the Company began to drive up the rate at which new Magic sets were released. As such, by 2020 the Company released a greater number of sets than any previous year, and was able to double the revenue of the Wizards segment between 2018 and 2021.

103.    Additionally, the Company occasionally released Magic sets containing reprints of previously released cards. However, reprinting Magic cards carries a direct risk of devaluing the existing cards held by players and collectors as the scarcity of such cards decreases. This concept was widely understood by Magic players and collectors, and served as a factor that could drive down consumer confidence, and thus sales of Magic sets.

104.    This pattern continued following Defendant Williams' appointment as President of Wizards in February 2022, to replace Defendant Cocks after he was appointed CEO of the Company. Under the direction of Defendant Williams, Wizards released a record 39 separate Magic sets in 2022. These sets were not limited to traditional expansion sets, but instead included box sets, compilation sets, supplemental sets, and digital sets.

105.    As noted above, investors and analysts began to grow concerned about the potential that the Company was overprinting Magic cards, and thus exceeding actual consumer demand. In response, the Individual Defendants defended the Company's actions as conforming to its segmentation strategy. According to the segmentation strategy, new Magic sets were only released "to meet demand" with regard to four categories of Magic consumers: collectors, competitive players, casual players, and players of the new online Magic Arena platform.

106.    Moreover, the Individual Defendants attempted to soothe investor and analyst concerns by reporting that its special 30th anniversary Magic set (the "Magic Anniversary Set") was "**out of stock**" within half an hour of its release, thus indirectly asserting that all of the Magic Anniversary Sets had been sold out. Market participants relayed the same information, with the publisher TheGamer issuing an article titled "Magic: The Gathering 30th Anniversary Edition Sells Out In Minutes,"[4] and the publisher Bell of Lost Souls issuing an article titled "M[agic]: W[izards] Sells Out of 30th Anniversary Sets in Under an Hour."[5]

**The Company Utilized the Revenue of Magic to Account for Revenue Shortfalls Elsewhere in the Company**

---

[4] Justin Reeve, *Magic: The Gathering 30th Anniversary Edition Sells Out In Minutes*, THEGAMER (Nov. 28, 2022), https://www.thegamer.com/magic-the-gathering-anniversary-edition-sells-out/.
[5] *MTG: WotC Sells Out Of 30th Anniversary Sets in Under An Hour*, BELL OF LOST SOULS (Nov. 28, 2022), https://www.belloflostsouls.net/2022/11/mtg-wotc-sells-out-of-30th-anniversary-sets-in-under-an-hour.html.

107.     As noted above, the Company's printing strategy for its Magic business resulted in significant short-term profits. These positive results coincided with increasingly poor results in the Company's other businesses, namely its Consumer Products segment. For instance, even as the Consumer Products segment reported weak sales and elevated inventories in 2022, the Company's revenue derived solely from its Magic business exceeded $1 billion.

108.     FE 1 reported that the Company began to overprint Magic cards in 2018, and noted that the reason for doing so was largely to account for poor financial performance in the Company's other businesses. FE 1 stated that Wizards established specific Magic sets to be rapidly produced and released to generate roughly $40 and $80 million in the event of shortfalls in other Company businesses. According to FE 1, Bill Rose, Senior Vice President for Magic, referred to the practice as "***Project Parachute***" (the "Parachute Strategy").

109.     In order to account for shortfalls in other elements of the Company's businesses, new Magic sets would thus be "parachuted in" to provide additional revenue. As such, the explosive growth in the Magic business noted just prior to and during the Relevant Period was in fact the result of the Parachute Strategy. Notably, in 2022 such "parachute" Magic sets accounted for 46% of all Magic releases.

110.     FE 1 reported that in the early stages of the Parachute Strategy, most parachute sets were "Masters" sets which consisted of reprinted cards and thus featured low production costs. FE 1 further stated that while Masters sets were sold prior to the Parachute Strategy, Masters sets sold under the Parachute Strategy were sold at higher prices. Prior to 2016, the Company released only two physical Masters sets. However, between 2016 and 2023, the Company released roughly double the number of Masters sets put out before 2016 (including digital releases).

111.    FE 1 continued to report that while the Parachute Strategy was intended for use in the event that additional short-term revenue was required, the strategy was implemented on a much larger basis. In fact, FE 1 stated that the Company was using its Parachute Strategy every year. FE 1 further reported that in 2019 the Company began to release "Secret Lair" sets which contained a smaller set of reprinted Magic cards. FE 1 stated that the Secret Lair sets provided a more reliable method of overprinting Magic sets. Largely due to Secret Lair sets, in 2022 the Company released over five times the amount of Magic sets it had released in 2016.

112.    FE 1 also stated that the Magic set known as Commander Legends: Battle for Baldur's Gate ("Baldur's Gate") served as a parachute set for the Company. Although most Magic sets are produced on a two-year timeline, FE 1 noted that the Baldur's Gate set was produced on a timeline of roughly one year, having been released in mid-2022. FE 2 reinforced FE 1's observations, stating that sets such as Baldur's Gate which were comprised of reprints could be produced under rushed circumstances to supplement the Company's short-term revenue.

113.    FE 3 corroborated the accounts of FE 1 and FE 2, as he attended quarterly business review meetings with Defendant Cocks and other Company executives. FE 3 reported that during such meetings, he viewed presentations concerning Magic and the rate of Magic set releases. FE 3 noted that some of these meetings contained discussions pertaining to the Parachute Strategy.

**The Company Concealed the True Reason for Halting the Sale of the Magic Anniversary Set**

114.    Although the Individual Defendants represented that the Magic Anniversary Set had sold out and was thus "out of stock," numerous market participants questioned whether the set had actually sold out or if the offer for the set had been paused by the Company itself. Notably, the Magic Anniversary Set's original announcement was met with a negative reaction amongst a significant portion of the Magic player-base.

115.    Market skepticism proved correct, as the Company in fact did not sell out the entirety of its Magic Anniversary Set as previously announced. FE 1, who was present in the Company's "war room" for the Magic Anniversary Set, reported that sales for the set were paused after it became apparent that sales were weaker than anticipated. Moreover, FE 1 stated that the Individual Defendants had developed a protocol prior to the release of the Magic Anniversary Set by which sales of the set would be cut off and the sale website would feature a message stating "out of stock" in the event of "underwhelming" sales.

116.    FE 6 likewise stated that the Company paused its sales of the Magic Anniversary Set less than an hour after its release, only selling a portion of its available inventory. FE 6 further noted that shortly after the set's release, he and other Wizards employees viewed photographs of Magic Anniversary Sets dropped off at a Texas landfill alongside older Magic products.

117.    FE 4 reported that the poor sales of the Magic Anniversary Set were discussed in executive leadership team meetings, notably its failure to meet the Company's projections. In addition, FE 2 stated that the Company distributed Magic Anniversary Sets to each Wizards employee for Christmas in 2022, further highlighting the product's poor sales performance.

**<u>False and Misleading Statements</u>**

***September 16, 2021 Investor Call***

118.    The Relevant Period began on September 16, 2021, when the Company held the September 2021 Investor Call. In attendance was Defendant Cocks, who at the time served the Company as President of Wizards. During the September 2021 Investor Call, the moderator asked Defendant Cocks about "the ***key drivers . . . behind [Magic] performance*** over the last couple of years."

119.    Defendant Cocks replied by stating "***We've been driving our growth to date on kind of a play-based segmentation***," and added that the "segmentation" strategy revolved around

marketing products to "*four segments*" i.e. competitive players, arena players, social players, and collectors. Defendant Cocks further stated that the strategy "*ha[d] really driven MAGIC's growth, and we see continuing to drive MAGIC's growth moving forward.*"

120.    The moderator also asked Defendant Cocks, "[s]hould we expect a more regular cadence of [Magic] card releases going forward?" Defendant Cocks responded by first emphasizing "*thinking about the customers and what they want*," and then explained that Magic was "*not trying to build one product for one customer that has to buy everything*," because "*the real growth and the real driver for us has been thinking about things on a segmented basis*."

121.    Later on during the September 2021 Investor Call, Defendant Cocks listed examples of products the Company released in connection with the segmentation strategy, stating that "*we've done new things like our Secret Lair card drops . . . for th[e collector] segment*."

*November 11, 2021 Jefferies Global Interactive Entertainment Conference*

122.    On November 11, 2021, Defendant Cocks represented the Company at the Jefferies Global Interactive Entertainment Conference (the 2021 Jefferies Conference").

123.    At the 2021 Jefferies Conference, Defendant Cocks was asked to "talk a little bit about how the [Hasbro Brand] Blueprint allows [Magic] to experience that explosive growth." In response, Defendant Cocks stated that "[*w*]*e drove all new segmentation for how we think about our product lines*."

*October 18, 2022 Earnings Call*

124.    On October 18, 2022, the Company hosted an earnings call to discuss its financial results for the third quarter of 2022 with investors and analysts (the "Q3 2022 Earnings Call").

125.    During the Q3 2022 Earnings Call, an analyst asked the following question:

There's been some investor concern that there's maybe been too many MAGIC releases in a short time frame. There's some talk of wallet fatigue among the players

out there. We've seen the secondary market prices come down a bit. So, I'm curious just what's your response to that concern that there's just a lot of MAGIC product coming all at once?

To which Defendant Williams responded by stating "***you've got the same number of sets happening in a year in the hobby channel***."

### *November 28, 2022 Magic Anniversary Set Release*

126.    On November 28, 2022, the Company released its Magic Anniversary Set through an online sale commencing at 9:00am Pacific Time. Within approximately thirty minutes of the Magic Anniversary Set release, a message was posted to the release website stating that the Magic Anniversary Set was "***out of stock***."

127.    The statements described in ¶¶ 118-126 were materially false and/or misleading when made because they failed to disclose, *inter alia*, that: (1) Hasbro's strategy with regard to printing Magic cards was not as carefully thought out as portrayed; (2) the Company was in fact printing a volume of Magic sets which exceeded consumer demand; (3) the Company's inventory allocation management was problematic, particularly as it pertained to the Company's printing strategy for Magic sets; (4) the Company was overloading the market with Magic sets to generate revenue and to offset shortfalls within the Company; (5) as a result of the Company's overprinting of Magic sets, existing Magic cards were devalued; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### **The Truth Begins to Emerge as the False and Misleading Statements Continue**

### *November 14, 2022 BofA Report*

128.    The truth began to emerge on November 14, 2022, when BofA issued the BofA Report concerning the Company's Magic business. The BofA Report revealed a "primary concern"

that "***Hasbro has been overproducing Magic cards which has propped up Hasbro's recent results but is destroying the long-term value of the brand***." The BofA Report observed that "Magic sales nearly doubled over the course of the pandemic" and that "Hasbro has kept the growth going with more frequent set releases, more product in each set and wider distribution."

129.    The BofA report further stated that the "increased supply" of Magic had "***caused distributors, collectors and local game stores to lose money on Magic***." As a result of Magic consumers' "***growing frustration***" with the ballooning number of Magic sets, the BofA report concluded, "***we expect they'll order less product in future releases***."

130.    The BofA Report featured the following graphic which observes the roughly 150% increase in the number of Magic sets released annually between 2019 and 2022:



131.    The BofA Report concluded, *inter alia*, that "***Magic has grown primarily by extracting more revenue from each player rather than by growing its player base***" through "a combination of ***increased set releases and increased price per set***." The BofA report further noted

that while Wizards revenue was "up 65% vs. 2019 to-date," consumer interest in Magic was only up 15% over the same period.

132.    As such, the BofA Report stated, "***Wizards has overprinted cards beyond demand***." In addition to the fact that new set releases were up —"several times this year," the BofA Report observed that "Wizards has printed and released more of both their most popular set releases . . . through third party distributors, and less popular ones . . . through product dumps on Amazon." The BofA report further stated that the strategy had "***benefited Wizard's revenue, but in the process, destroyed secondary market values***[.]"

133.    Moreover, the BofA Report noted that "[***s***]***even of the past eight major set releases have seen prices decline from their initial levels*** with declines ranging from -11% to -57%," and "stores, collectors and players ***can't trust that sets will retain their value***." The BofA Report went on to state that "***sell-through has been weak with unpopular sets from last year***," and that "national retailers [such as Target, Walmart, Best Buy, and GameStop] are ***reducing Magic shelf space***." As such, the BofA Report noted that "those [retailers] that continue to carry [Magic] are ***heavy with aged inventory***."

134.    The BofA Report also discussed the Magic Anniversary Set, reporting that the price of $999 for four booster packs was "excessively high" as compared to the $5 cost of a "typical set pack[.]" The BofA Report also observed that "the set also includes Reserved List cards ***which Hasbro had promised to never reprint***." As such, the BofA Report stated that the Magic Anniversary Set was further "encouraging more players to use 'proxies,' which are unsanctioned cards not produced by Wizards."

135.    The BofA Report's headlines underlined its findings pertaining to the Company's Magic business: "***Overprinting Magic destroys its long-term value***" and "***Magic needs to cut print***

*runs to support prices*." The BofA Report noted that BofA analysts reduced the Company's target price from $73 to $42 per share, and changed the Company's stock rating from "***Buy***" to "***Underperform***."

136.    On this news, the price of the Company's stock fell $6.25, or approximately 9.9%, from a closing price of $63.41 per share on November 11, 2022, to close at $57.16 per share on November 14, 2022. Nevertheless, the Individual Defendants continued to obfuscate the true nature of its printing strategy for Magic cards.

### *December 8, 2022 Hasbro Special Call*

137.    On December 8, 2022, the Company hosted the December 2022 Special Call with investors and analysts to discuss the BofA Report and the Magic Anniversary Set, with the call being explicitly "focus[ed]" on Magic "and Hasbro's long-term strategy for its gaming business."

138.    During the December 2022 Special Call, a UBS analyst asked Defendant Williams the following question: "if it isn't price, are you releasing then more product this year? Could you sort of go through pillars of growth for Magic?" Defendant Williams responded that "[*o*]*ur growth is coming from both our customer and product segmentation strategy* . . . [a]nd as a result, we're serving more player segments [than ]ever before, ***and so th[at]'s going to shift [] how many SKUs we released in a year***." In addition, Defendant Williams stated that [*o*]*ur growth has come from monetizing more player segments and not just from increasing the spend of the same core set of players, and our product release schedule really reflects that*."

139.    Also during the December 2022 Special Call, Defendant Cocks cited the segmentation strategy as the reason why the Company had "***either tripled or come close to triple the overall Magic business***" over the past six years, and added that "***when we look at how we think about growing Magic over time . . . it's about leaning into our segmentation strategy***."

140.    Later on during the December 2022 Special Call, Defendant Williams was asked to "answer" the "claim that you're printing too many cards[.]" Defendant Williams replied that "*there is no evidence that Magic is overprinted*."

141.    A UBS analyst noted that "[t]here has been some chatter . . . that [secondary market card] values are coming down because you're printing too much," and asked, "Is that something that you keep track of? Is that something that concerns you?" Defendant Williams replied by stating "*we print and reprint products to meet demand from our players*." Moreover, Defendant Williams stated that during the year Wizards had "expanded the number of booster product types" and "smaller print run products" released "*to meet player preferences*."

142.    Additionally, during the December 2022 Special Call, Defendant Williams spoke about the Magic Anniversary Set, stating that "sometimes we step back and look[] to customer feedback like we did on our recent 30th anniversary edition, where *we scaled back the expected supply to ensure a great collector experience*."

143.    The statements described in ¶¶ 137-142 were materially false and/or misleading when made because they failed to disclose, *inter alia*, that: (1) Hasbro's strategy with regard to printing Magic cards was not as carefully thought out as portrayed; (2) the Company was in fact printing a volume of Magic sets which exceeded consumer demand; (3) the Company's inventory allocation management was problematic, particularly as it pertained to the Company's printing strategy for Magic sets; (4) the Company was overloading the market with Magic sets to generate revenue and to offset shortfalls within the Company; (5) as a result of the Company's overprinting of Magic sets, existing Magic cards were devalued; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

*January 26, 2023 Earnings Call*

144.    The truth continued to emerge on January 26, 2023, when the Company issued the Q4 2022 Press Release. The Q4 2022 Press Release reported that Wizards' year-over-year fourth quarter revenue growth had fallen substantially short of analysts' expectations and Company guidance, by double-digit percentages. Moreover, Wizards' growth for the full-year 2022 was also lower than analysts' expectations.

145.    The Q4 2022 Press Release quoted Defendant Cocks as stating that the Company's Consumer Products segment had "underperformed" in the fourth quarter. The Q4 2022 Press Release also revealed that the Company would "eliminat[e] . . . approximately 15% of its global workforce" in the coming year, and announced the departure of the Company's COO, who had overseen the Consumer Products division.

146.    On this news, the price of the Company's stock fell $5.17, or approximately 8.1%, from a closing price of $63.78 per share on January 26, 2023, to close at $58.61 per share on January 27, 2023. Nevertheless, the Individual Defendants continued to obfuscate the true nature of its printing strategy for Magic cards.

*April 27, 2023 Earnings Call*

147.    On April 27, 2023, the Company hosted the Q1 2023 Earnings Call with investors and analysts.

148.    During the Q1 2023 Earnings Call, Defendant Cocks discussed the Company's elevated inventory levels, stating "[o]*ur owned inventory is up a bit, but most of that has to do with kind of the nature of Wizards production*." In addition, Deborah Thomas, the Company's Chief Financial Officer ("CFO") at the time, stated that *"higher Wizards of the Coast inventories" were due to "the timing of [Magic] releases this year,"* including the "March of the Machines

release [in] mid-April" and "Universes Beyond: The Lord of the Rings, Tales of the Middle-Earth shortly before the start of Q3."

### May 3, 2023 Form 10-Q

149. On May 3, 2023, the Company filed its quarterly report on Form 10-Q with the SEC to report its financial results for the first quarter of 2023 (the "Q1 2023 10-Q"). Attached to the Q1 2023 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendant Cocks, attesting to the accuracy of the Q1 2023 10-Q and that "the information contained in the [Q1 2023 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

150. The Q1 2023 10-Q stated that "[t]he increase in [Hasbro's inventories] during the first quarter of 2023 was driven primarily by *higher inventory balances within the Wizards of the Coast and Digital Gaming segment, most notably in anticipation of several upcoming MAGIC: THE GATHERING set releases*."

151. The statements described in ¶¶ 147-150 were materially false and/or misleading when made because they failed to disclose, *inter alia*, that: (1) Hasbro's strategy with regard to printing Magic cards was not as carefully thought out as portrayed; (2) the Company was in fact printing a volume of Magic sets which exceeded consumer demand; (3) the Company's inventory allocation management was problematic, particularly as it pertained to the Company's printing strategy for Magic sets; (4) the Company was overloading the market with Magic sets to generate revenue and to offset shortfalls within the Company; (5) as a result of the Company's overprinting of Magic sets, existing Magic cards were devalued; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

*October 26, 2023 Press Release and Earnings Call*

152.    The truth finally emerged on October 26, 2023, before the market opened, when Hasbro issued its Q3 2023 Press Release. The Q3 2023 Press Release reported that the Company had "[r]educed owned inventory [by] 27%" companywide, but that Consumer Products inventories decreased by 34%. As noted above, given that Wizards was the only other Company segment which possessed inventory, by virtue of mathematics the Wizards segment had less inventory improvement as compared to the Company as a whole.

153.    That same day, the Company hosted the Q3 2023 Earnings Call. During the Q3 2023 Earnings Call, Gina Goetter, the Company's CFO, stated that the "reduc[tion in] total owned inventory" was "***primarily driven by [the] reduction in [non-Wizards] inventory***," and cut its guidance for the year, announcing a $50 million "onetime cost" to "move through inventory," including "extra marketing" and "extra obsolescence cost[s]."

154.    On this news, the price of the Company's stock fell $8.91 per share, or approximately 16.3%, from a closing price of $54.75 per share on October 25, 2023, to close at $45.84 per share on October 27, 2023.

## REPURCHASES DURING THE RELEVANT PERIOD

155.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of ***approximately $125 million*** to repurchase approximately 1.4 million shares of its own common stock at artificially inflated prices between April 2022 and July 2022.

156.    According to a Form 10-Q the Company filed with the SEC on July 26, 2022 for the quarterly period ended June 26, 2022 (the "Q2 2022 10-Q"), between March 28, 2022 and April 24, 2022, the Company purchased 101,591 shares of its common stock for approximately $8,997,915, at an average price of $88.57 per share.

157.    As the Company's stock was actually worth only $48.37 per share, the price at closing on October 26, 2023, the Company overpaid by approximately $4,083,958 for repurchases of its stock between March 28, 2022 and April 24, 2022.

158.    According to the Q2 2022 10-Q, between April 25, 2022 and May 29, 2022, the Company purchased 793,753 shares of its common stock for approximately $70,985,331, at an average price of $89.43 per share.

159.    As the Company's stock was actually worth only $48.37 per share, the price at closing on October 26, 2023, the Company overpaid by approximately $32,591,498 for repurchases of its stock between April 25, 2022 and May 29, 2022.

160.    According to the Q2 2022 10-Q, between May 30, 2022 and June 26, 2022, the Company purchased 521,829 shares of its common stock for approximately $43,990,185, at an average price of $84.30 per share.

161.    As the Company's stock was actually worth only $48.37 per share, the price at closing on October 26, 2023, the Company overpaid by approximately $18,749,316 for repurchases of its stock between May 30, 2022 and June 26, 2022.

162.    According to a Form 10-Q the Company filed with the SEC on October 26, 2022 for the quarterly period ended September 25, 2022, between June 27, 2022 and July 24, 2022, the Company purchased 11,679 shares of its common stock for approximately $1,000,890, at an average price of $85.70 per share.

163. As the Company's stock was actually worth only $48.37 per share, the price at closing on October 26, 2023, the Company overpaid by approximately $435,977 for repurchases of its stock between June 27, 2022 and July 24, 2022.

164. Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by approximately $55,860,749.

## THE INDIVIDUAL DEFENDANTS' KNOWLEDGE

165. Throughout the Relevant Period, the Individual Defendants had access to internal metrics regarding the Company's overprinting of Magic cards. The Individual Defendants' knowledge as to the materially false and misleading nature of the statements they made is evident through the accounts of several former employees of the Company.

### Former Employee Testimony

166. For instance, FE 1 reported that, under the direction of Defendant Cocks, as early as 2018 the Company established Magic sets for the purpose of rapid manufacture and release. FE 1 explained that such Magic sets were intended to provide roughly $40 million to $80 million for the Company in the event of revenue shortfalls in its other businesses. FE 1 noted that the Company's former CEO would relay to Defendant Cocks, then-President of Wizards, that the Company needed $80 million in revenue to account for failing ventures elsewhere. According to FE 1, Defendant Cocks then instructed Bill Rose or FE 1 himself to release new Magic Sets pursuant to the Parachute Strategy.

167. FE 1 recounted that the Parachute Strategy continued following Defendant Cocks' appointment as CEO of the Company, under the direction of both Defendant Cocks and Defendant Williams. According to FE 1, Defendant Cocks introduced the concept of the Parachute Strategy to Defendant Williams as a method of supplementing other Company shortfalls. Moreover, FE 1

reported that he later heard Defendant Cocks repeat this statement to Defendant Williams firsthand.

168.    FE 3 attended quarterly business review meetings with Defendant Cocks and other Company executives. FE 3 reported that during such meetings, he viewed presentations from the Wizards segment including presentations concerning Magic and the pace of Magic set releases. FE 3 also noted that during some of these meetings, the Parachute Strategy was discussed by participants. Similarly, FE 4 attended weekly executive leadership team meetings with the Individual Defendants during the Relevant Period. FE 4 noted that during these meetings, the principles of the Parachute Strategy were also discussed, i.e. the release of additional Magic sets to generate short term revenue.

169.    FE 4 also reported that during the meetings he attended, the participants discussed the conclusion that the Company's overprinting of Magic cards directly resulted in the declining demand for Magic products. FE 4 further noted that when this observation was put before Individual Defendants, the Individual Defendants merely asked follow-up questions and instructed Company employees to continue attempting to offload unsold Magic sets. In addition, FE 4 reported that Magic's secondary market was discussed throughout the meetings he attended with Company executives.

170.    Notably, FE 1 reported that when the BofA Report was published, Company employees who were aware of the Parachute Strategy acknowledged the BofA Report's veracity. Following the BofA Report's publication on November 14, 2022, FE 1 stated that Company employees ranging from the lines staff to the directors had made comments noting that BofA was correct in their reporting.

171.    FE 5 corroborated the account of FE 1 concerning the BofA Report. He stated that following the release of the BofA Report, he and several other former and then-current Company employees discussed its contents in a Whatsapp group chat. Such employees included Retail Experience Specialist Andrea Vitali, Senior Commercial Director Davide Bonati, and Key Account Manager Frank Hanford. According to FE 5, all of the group chat participants agreed that the BofA Report was correct. Moreover, FE 5 stated that all of the participants agreed that they had all been aware of the Company's overprinting issues.

172.    Regarding the Magic Anniversary Set release, FE 1 reported that the Individual Defendants' were aware that the set was not out of stock due to being sold out but rather due to being pulled for poor performance. FE 1 reported that he was present in the "war room" for the Magic Anniversary Set release, alongside Company executives such as Magic Senior Vice President Ken Troop. FE 1 stated that, minutes after the release began, sales were stopped by the Company to conceal the observation that sales of the Magic Anniversary Set would be much lower than anticipated.

173.    FE 1 reported that Wizards personnel, including Defendant Williams, established a protocol for the Magic Anniversary Set release in the event of poor performance. According to the protocol, FE 1 stated that sales would be prevented and the Company's sales website would display a message stating, "out of stock." As such, FE 1 reported that Defendant Williams was in continuous communication with the war room during the Magic Anniversary Set release and also noted that Ken Troop possessed the capacity to shut down sales of the set.

174.    FE 1 also relayed that Defendant Cocks was aware of the Magic Anniversary Set release's protocol prior to the release date. In addition, FE 1 stated that when Ken Troop acted to shut down sales and post the "out of stock" message on the Company's sales website, his actions

were immediately communicated to Defendant Williams. According to FE 1, Defendant Williams replied with a thumbs-up to approve Ken Troop's decision. FE 1 also stated that Defendant Cocks would have been informed of the actions taken by Ken Troop or Defendant Williams swiftly after its occurrence per Company policy.

### The Individual Defendants Routinely Reviewed the Company's Financial Statements and the Company's Magic Business

175.    Throughout the Relevant Period, the Board and the Board's Committees met regularly to discuss the Company's financial position, its financial statements, and its Magic business.

176.    ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████

177.    ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██

178. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████

179. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



180.

181.

182.



183.

184.

185.

186.

187. 

188.

189.

190.    

191.

192. 

193.

194.



195. ███████████████████████████████████

196. ███████████████████████████████████

## DAMAGES TO HASBRO

197.    As a direct and proximate result of the Individual Defendants' conduct, Hasbro has lost and expended, and will continue to lose and expend, many millions of dollars.

198.    Such losses include approximately $55.9 million the Company overpaid when it repurchased its own stock at artificially inflated prices during the Relevant Period before the fraud was exposed.

199.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

200.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

201.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

202.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

203.    As a direct and proximate result of the Individual Defendants' conduct, Hasbro has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

## DERIVATIVE ALLEGATIONS

204.    Plaintiffs bring this action derivatively and for the benefit of Hasbro to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Hasbro, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

205.    Hasbro is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

206.    Plaintiffs are, and have been at all relevant times, a shareholder of Hasbro. Plaintiffs will adequately and fairly represent the interests of Hasbro in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

207.    Plaintiffs incorporate by reference and re-allege each and every allegation stated above as if fully set forth herein.

208.    A pre-suit demand on the Board of Hasbro is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following ten individuals: Defendants Cocks, Cochran, Gersh, Hamren, Richie, Stoddart, and West (the "Director-Defendants") and non-parties Frank D. Gibeau, Darin S. Harris, and Owen Mahoney (collectively with the Director-Defendants, the "Directors"). Plaintiffs need only to allege demand futility as to five of the ten Directors who are on the Board at the time this action is commenced.

209.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and

misleading statements and omissions of material facts, and, at the same time, to cause the Company to overpay by approximately $55.9 million for repurchases of its own, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

210. As Board members of Hasbro charged with overseeing the Company's affairs, all of the Director-Defendants must have had knowledge of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Hasbro, the Director-Defendants must have been aware of the material facts regarding Company's overprinting of Magic sets.

211. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Hasbro to issue materially false and misleading statements. Specifically, the Director-Defendants caused Hasbro to issue false and misleading statements which were intended to make Hasbro appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

212. Additional reasons that demand on Defendant Cocks is futile follow. Defendant Cocks has served as the Company's CEO and as a Company director since February 2022. The Company provides Defendant Cocks with his primary form of income. Thus, as the Company admits, he is not an independent director. As the Company's highest officer, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

Moreover, Defendant Cocks signed the SOX certifications for the materially false and misleading Q1 2023 10-Q. In addition, Defendant Cocks made many of the false and misleading statements alleged herein. Moreover, Defendant Cocks is named as a defendant in the Securities Class Action. For these reasons, too, Defendant Cocks breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

213.    Additional reasons that demand on Defendant Cochran is futile follow. Defendant Cochran has served as a Company director since 2016. She also serves as the Chair of the Financial and Capital Allocation Committee and as a member of the Audit Committee. Defendant Cochran receives handsome compensation for her role as a director. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Cochran breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

214.    Additional reasons that demand on Defendant Gersh is futile follow. Defendant Gersh has served as a Company director since 2010. She also serves as the Chair of the Compensation and Talent Committee and as a member of the Nominating, Governance and Social Responsibility Committee. Defendant Gersh receives handsome compensation for her role as director. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and

consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Gersh breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

215.    Additional reasons that demand on Defendant Hamren is futile follow. Defendant Hamren has served as a Company director since 2022. She also serves as a member of the Compensation Committee. Defendant Hamren receives handsome compensation for her role as director. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Hamren breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

216.    Additional reasons that demand on Defendant Richie is futile follow. Defendant Richie has served as a Company director since 2020. She also serves as a member of the Compensation and Talent Committee and the Nominating, Governance and Social Responsibility Committee. Defendant Richie receives handsome compensation for her role as director. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Richie breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

217.     Additional reasons that demand on Defendant Stoddart is futile follow. Defendant Stoddart served as Interim CEO from October 2021 to February 2022. He also has served as a Company director since 2014 and as Chairman of the Board since February 2022. He currently serves as a member of the Compensation Committee and the Nominating, Governance, and Social Responsibility Committee. Defendant Stoddart receives handsome compensation for his role as a director. As a trusted, long-time Company director, and formerly the Company's highest officer, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Stoddart breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

218.     Additional reasons that demand on Defendant West is futile follow. Defendant West has served as a Company director since 2016. She also serves as the Chair of the Nominating, Governance and Social Responsibility Committee and as a member of the Finance and Capital Allocation Committee. Defendant West receives handsome compensation for her role as a Company director. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant West breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

219.     Additional reasons that demand on the Board is futile follow.

220.



221.    Defendants Cochran and Leinbach (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the

Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

222.



223.    All the Director-Defendants breached the duty of candor by making, or causing the Company to make, false and misleading statements regarding the Company's business, operations, and prospects, despite having knowledge of the falsity of those statements. The Director-Defendants may not be indemnified for breaching the duty of candor. As a result, all the Director-Defendants face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

224.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. In

further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, and conduct business in an honest and ethical manner. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

225.    The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

226.    The acts complained of herein constitute violations of fiduciary duties owed by Hasbro's officers and directors, and these acts are incapable of ratification.

227.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Hasbro. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Hasbro, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the

other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

228.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Hasbro to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

229.    Thus, for all the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act

230.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

231.    The Individual Defendants, by virtue of their positions with Hasbro and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Hasbro and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Hasbro to engage in the illegal conduct and practices complained of herein.

232.    Plaintiffs, on behalf of Hasbro, have no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

233.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

234.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Hasbro. Not only is Hasbro now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Hasbro by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase 1,428,852 of its own shares at artificially-inflated prices, damaging Hasbro.

235.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

236.    The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Hasbro not misleading.

237.    The Individual Defendants, as top executives and directors of the Company are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and

did control the conduct complained of herein and the content of the public statements disseminated by Hasbro.

238.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

239.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

240.    Plaintiffs, on behalf of Hasbro, have no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

241.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

242.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Hasbro's business and affairs.

243.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

244.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Hasbro.

245.    In breach of their fiduciary duties owed to Hasbro, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) Hasbro's strategy with regard to printing Magic cards was not as carefully thought out as portrayed; (2) the Company was in fact printing a volume of Magic sets which exceeded consumer demand; (3) the Company's inventory allocation management was problematic, particularly as it pertained to the Company's printing strategy for Magic sets; (4) the Company was overloading the market with Magic sets to generate revenue and to offset shortfalls within the Company; (5) as a result of the Company's overprinting of Magic sets, existing Magic cards were devalued; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

246.    As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

247.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, thus rendering them personally liable to the Company for breaching their fiduciary duties.

248.    Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

249.    In yet further breach of their fiduciary duties, during the Relevant Period, while the Company's common stock was at artificially inflated prices before the fraud was exposed, the Individual Defendants caused Hasbro to repurchase millions of shares of Company common stock while the price for said stock was artificially inflated.

250.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Hasbro's securities.

251.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Hasbro's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

252.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

253.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Hasbro has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

254.    Plaintiffs, on behalf of Hasbro, have no adequate remedy at law.

## FOURTH CLAIM
### Against Individual Defendants for Unjust Enrichment

255.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

256.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Hasbro.

257.    The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from Hasbro that was tied to the performance or artificially inflated valuation of Hasbro, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

258.    Plaintiffs, as shareholders and a representatives of Hasbro, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

259.    Plaintiffs, on behalf of Hasbro, have no adequate remedy at law.

## FIFTH CLAIM
### Against Individual Defendants for Waste of Corporate Assets

260.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

261.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Hasbro to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend

unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

262.    In addition, the Individual Defendants caused the Company to repurchase its own common stock at artificially inflated prices, thereby wasting the Company's assets.

263.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

264.    Plaintiffs, on behalf of Hasbro, have no adequate remedy at law.

## SIXTH CLAIM
### Against Individual Defendants for Gross Mismanagement

265.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

266.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Hasbro in a manner consistent with the operations of a publicly held corporation.

267.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Hasbro has sustained and will continue to sustain significant damages.

268.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

269.    Plaintiffs, on behalf of Hasbro, have no adequate remedy at law.

## SEVENTH CLAIM
### Against Individual Defendants for Abuse of Control

270.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

271.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Hasbro, for which they are legally responsible.

272.    As a direct and proximate result of the Individual Defendants' abuse of control, Hasbro has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

273.    Plaintiffs, on behalf of Hasbro, have no adequate remedy at law.

## EIGHTH CLAIM
### Against Defendants Cocks and Williams for Contribution Under Sections 10(b) and 21D of the Exchange Act

274.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

275.    Hasbro and Defendants Cocks and Williams are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Cocks', and Williams' willful and/or reckless violations of their obligations as officers and/or directors of Hasbro.

276.    Defendants Cocks and Williams, because of their positions of control and authority as officers and/or directors of Hasbro, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Hasbro, including the wrongful acts complained of herein and in the Securities Class Action.

277.    Accordingly, Defendants Cocks and Williams are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

278.    As such, Hasbro is entitled to receive all appropriate contribution or indemnification from Defendants Cocks and Williams.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiffs may maintain this action on behalf of Hasbro, and that Plaintiffs are an adequate representative of the Company;

(b)    Declaring that each of the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Hasbro;

(c)    Determining and awarding to Hasbro the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Hasbro and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Hasbro and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and

guidelines of the board;

    2.  a provision to permit the shareholders of Hasbro to nominate at least five candidates for election to the Board; and

    3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

    (e)    Awarding Hasbro restitution from Individual Defendants, and each of them;

    (f)    Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

    (g)    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: January 21, 2026

                    **HIGGINS, CAVANAGH & COONEY, LLP**

                    */s/ Stephen P. Cooney*
                    Stephen P. Cooney (Bar No. 6803)
                    10 Dorrance Street, Suite 400
                    Providence, RI 02903
                    Telephone: (401) 272-3500
                    Facsimile: (401) 273-8780
                    Email: scooney@hcc-law.com

                    **THE BROWN LAW FIRM, P.C.**
                    Sarah Maneval
                    Saadia Hashmi
                    767 Third Avenue, Suite 2501
                    New York, NY 10017
                    Telephone: (516) 922-5427
                    Facsimile: (516) 344-6204
                    Email: smaneval@thebrownlawfirm.net
                    Email: shashmi@thebrownlawfirm.net

                    *Counsel for Plaintiff*

## **<u>VERIFICATION</u>**

       I, Joseph Crocono, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

       I declare under penalty of perjury that the foregoing is true and correct.  Executed this ___ day of January, 2026.

8

Signed by:

*Joseph Crocono*
01EQ098B8F934F2...

Joseph Crocono

## **VERIFICATION**

I, Ultan McGlone, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 8th__ day of January, 2026.

Signed by:

_____
Ultan McGlone